IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEROME HALES, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 12-3495 |
| | : | |
| CHARLES FELL, | : | |
| *City of Chester Police Captain, in Both* | : | |
| *His Official and Individual Capacity*, et | : | |
| al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                    **May 23, 2013**

Plaintiffs Jerome Hales, John Robertson, and Mikeem Brigman bring this action against Defendants Captain Charles Fell and Officer Timothy Garron of the City of Chester Police Department alleging false arrest, malicious prosecution, and conspiracy in violation of 42 U.S.C. § 1983 (Count I).  Plaintiffs also assert state tort claims for malicious prosecution, false arrest, false imprisonment, and intentional infliction of emotional distress (Counts V through VIII).[1] Plaintiffs allege Fell and Garron lacked probable cause to arrest them on attempted homicide and armed robbery charges which were later dismissed.  Defendants have filed a motion for summary judgment, arguing Plaintiffs' arrests were supported by probable cause, and even if probable cause was lacking Defendants are entitled to qualified immunity.  For the following reasons, the motion for summary judgment will be granted.

---

[1] Plaintiffs' Amended Complaint also named as Defendants Officer Meyers, Officer Robert Archacki, Police Chief Floyd C. Lewis, III, and the City of Chester; however, these Defendants were dismissed by prior Order.  Plaintiffs do not oppose summary judgment on their state law tort claims for assault and battery (Count IV).  Plaintiffs' claims against John Doe Police Officers 1 and 2 will be dismissed because Plaintiffs have not identified these Defendants.  *See Blakeslee v. Clinton Cnty.*, 336 F. App'x 248, 250-51 (3d Cir. 2009) ("If reasonable discovery does not unveil the proper identities . . . the John Doe defendants must be dismissed."); *Adams v. City of Camden*, 461 F. Supp. 2d 263, 271 (D.N.J. 2006) (noting John Doe defendants must be dismissed pursuant to Federal Rule of Civil Procedure 21 if they are not identified after discovery).

**FACTS**[2]

On July 4, 2010, the City of Chester was in a state of emergency due to a rash of recent violent crimes. Consequently, the City had imposed a 9:00 p.m. curfew on July 4 for all residents. At around 11:15 p.m., in the area of 22nd and Chestnut Streets in Chester, Ariel Pierce and Brian Iovino were robbed while walking home from a convenience store by three or possibly four black males, one of which threatened them with a gun.[3] The robbers took approximately $30 and two cellular phones. As the robbers fled, Iovino chased them on foot and one of the robbers fired a gun at him. Chester Police officers, including Officer Garron, were called to the robbery scene and took a statement from Pierce and Iovino. After giving their statements, Pierce and Iovino were driven to their home. A flash information was broadcast to all patrols describing the offenders as three black males in their teens or early twenties wearing black and white t-shirts.

During the initial investigation at the robbery scene, Iovino told Garron one of the stolen phones was equipped with a global positioning system (GPS). Garron contacted the phone's service provider, which, about 25 minutes later, was able to locate the phone using its GPS to within 25 meters of a location on the 500 block of East 8th Street in Chester. Upon receiving this information, Garron and other police officers immediately proceeded to that location.

Meanwhile, Plaintiffs had been at a family barbecue at 530 East 8th Street for several hours. At some point shortly before midnight, 15-year-old Lamar Queen, who lived a few

---

[2] "On a motion for summary judgment, a district court must view the facts in the light most favorable to the non-moving party, and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[3] Pierce testified in her deposition related to the instant matter that the night she was robbed she believed there were four assailants and may have told that to the police, but now believes there were possibly three. Iovino testified in his deposition he always believed there were three robbers. The Affidavit of Probable Cause completed by Officer Garron states the victims initially reported being robbed by three men.

houses down from 530 East 8th Street, arrived in a car with two males and a female. Queen's friends walked towards Queen's house, while Queen lingered in an area closer to 530 East 8th Street, speaking with his father. After a brief conversation with his father, Queen walked toward 530 East 8th Street and greeted the partygoers, including Plaintiffs.[4]

At that moment, Chester Police officers, including Garron, arrived on the 500 block of East 8th Street. Garron observed Plaintiffs and Queen in close proximity to one another and within the approximate area indicated by the stolen phone's GPS. Garron also observed that Plaintiffs and Queen matched the descriptions of the suspects—all four were black males appearing to be in their teens or twenties wearing white or black t-shirts (Hales and Robertson wore black shirts, Brigman wore a white shirt, and Queen wore either a white or black shirt). Garron effected a pedestrian stop of all four and searched their persons for weapons. In searching Queen, Garron felt a cellular phone inside Queen's pocket and retrieved it. That phone matched the description of the stolen phone not equipped with GPS. Garron also retrieved cellular phones from Brigman and Robertson, which did not match the descriptions of either stolen phone. Based on the fact Queen and Plaintiffs matched the descriptions of the suspects and were found within the approximate range of the tracked stolen phone, and based on Queen's possession of a phone matching the description of one of the stolen phones, Garron asked Captain Fell (a Sergeant at the time), who had been on patrol elsewhere in Chester that evening, to bring Pierce and Iovino to the 800 block of East 8th Street to attempt to identify the suspects.

Thereafter, Pierce and Iovino received a phone call from someone with the Chester Police Department asking them to accompany a police officer to a location to attempt to identify four

---

[4] Robertson testified he did not greet Queen because he was several feet down the street from 530 E. 8th Street speaking with a neighbor. Hales testified, however, Queen was speaking with all three Plaintiffs.

individuals as the possible robbers.  According to Iovino, the caller also informed him the four suspects were apprehended in the proximity of where the stolen phone with GPS was tracked and one suspect was found carrying a phone matching the description of the other stolen phone. There is no evidence suggesting the caller was Garron or Fell.

Someone from the Chester Police Department called Fell over the phone to tell him Pierce and Iovino's address so as not to broadcast the address over the police radio.  Fell picked up the witnesses at their home at or around 12:00 a.m.  On the ride to the 800 block of East 8th Street, the three spoke only briefly, and they did not discuss the circumstances of the suspects' apprehension.[5]  Fell, Pierce, and Iovino arrived at the 800 block of East 8th Street at approximately 12:10 a.m.  Soon after their arrival, Fell and/or another officer at the scene told Pierce and Iovino police had found a phone matching the stolen phone without GPS on Queen and asked for that phone's number so they could call and confirm it was the stolen phone.  Pierce and Iovino provided the phone number and watched as an officer dialed the number, causing a phone sitting on the hood of a car next to where the four suspects stood to ring.  An officer then brought the phone to Pierce, who confirmed it was the phone without GPS which had been stolen during the robbery.

---

[5] Plaintiffs argue Fell and Garron were responsible for telling Pierce and Iovino that the suspects were apprehended in the area where one of the phones was tracked, but the record is devoid of any facts attributing the disclosure of that information to Fell or Garron.  There is no evidence suggesting Fell or Garron was the officer who initially called Pierce and Iovino to request they participate in an identification procedure.  Pierce and Iovino's account of that phone call is the only evidence they were told about the suspects being found in the area where the phone was tracked.  Fell testified he never told them the suspects were found in the area where the phone was tracked while driving them to the identification scene or during the identification procedure. Pierce's and Iovino's testimony corroborates Fell's account.

Next, Pierce and Iovino were asked if they could identify each of the four suspects.[6]  The two victims remained in the back seat of Fell's patrol vehicle, about 20 to 30 feet away from the suspects and viewed each suspect in turn.  The four suspects stood in a line facing Fell's patrol vehicle and were illuminated by police headlights.  Fell remained in the car with the victims and conducted the identification, while Garron stood near the suspects.  Both Pierce and Iovino positively identified Queen as the individual who was carrying the gun and who shot at Iovino.  Pierce also identified each of the Plaintiffs as an individual who had robbed them.  Iovino testified at his deposition he could only recognize Queen, but admitted later in his deposition it was possible he indeed identified Plaintiffs that night as well, although he now believes he did not recognize Plaintiffs as being among the men who committed the robbery.  Fell testified both witnesses definitively identified all four suspects.  Fell relayed the identifications of all four suspects to Garron, who arrested Queen and Plaintiffs.  Fell then drove the victims back to their home.  Fell, Pierce, and Iovino were present at the 500 block of East 8th Street for approximately five minutes.

Garron prepared Affidavits of Probable Cause and Criminal Complaints for Queen and Plaintiffs.  All four were charged with attempted homicide, robbery, conspiracy, aggravated assault, and a host of other lesser offenses.  At the preliminary hearing on September 20, 2010, Iovino testified he saw only the face of the suspect with the gun, i.e. Queen, and could not identify Plaintiffs.  Pierce did not testify.  Consequently, all charges against Plaintiffs were dismissed, and the case against Queen proceeded.

---

[6] Both Garron and Fell testified they did not call the phone found on Queen until after the witnesses identified the four suspects.  Because the facts are viewed in the light most favorable to Plaintiffs, however, the Court accepts for the purposes of this motion Pierce's and Iovino's testimony that Fell and Garron caused the stolen phone to be identified before the suspects were identified.

Plaintiffs subsequently filed this civil rights action.  The remaining claims are § 1983 claims for false arrest, malicious prosecution, and conspiracy, and state claims for malicious prosecution, false arrest, false imprisonment, and intentional infliction of emotional distress. After discovery, Fell and Garron filed the instant motion for summary judgment.

**DISCUSSION**

A motion for summary judgment shall be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  The court "must view the facts in the light most favorable to the non-moving party, and must make all reasonable inferences in that party's favor." *Hugh*, 418 F.3d at 267.  To defeat a summary judgment motion, the non-moving party "must rely on affidavits, depositions, answers to interrogatories, or admissions on file" to show there is a genuine issue of material fact.  *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 199 (3d Cir. 2001) (quotation omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Defendants argue they are entitled to summary judgment on Plaintiffs' § 1983 claims because the record shows they did not violate Plaintiffs' constitutional rights as a matter of law and, even if they did, they are entitled to qualified immunity because the rights violated were not clearly established at the time of Plaintiffs' arrests.

Plaintiffs assert three theories of liability under § 1983.  First, Plaintiffs bring false arrest claims alleging Fell and Garron arrested them without probable cause in violation of their Fourth Amendment right to be free from unreasonable seizures.  *See James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012) ("To state a claim for false arrest under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause.").  Specifically, Plaintiffs argue their arrests were not supported by probable cause because the "showup" procedure conducted by Fell and Garron used to obtain the identifications from the victims was unduly suggestive, and without the identifications there was not sufficient evidence to justify the arrests.  "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995).  A determination of probable cause must consider the totality of the circumstances and assess the knowledge of the police officer at the time of the arrest in conjunction with the factual occurrences immediately leading to the arrest.  *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983); *United States v. Stubbs*, 281 F.3d 109, 122 (3d Cir. 2002).

Although a criminal defendant's due process rights are violated when evidence resulting from an unduly suggestive identification procedure is used at trial, an unduly suggestive procedure itself does not violate any of the defendant's constitutional rights and cannot alone form the basis of a § 1983 claim.  *See Wray v. City of N.Y.*, 490 F.3d 189, 193 (2d Cir. 2007) (citing *Manson v. Brathwaite*, 432 U.S. 98, 113 n.13 (1977)); *Hensley v. Carey*, 818 F.2d 646, 650 (7th Cir. 1987).  Accordingly, Plaintiffs cannot defeat summary judgment by simply showing a material factual dispute as to the suggestiveness of the showup identification

procedure.  Rather, they must show a material issue of fact exists as to whether, considering the totality of the circumstances, the unreliability of the identifications due to the suggestiveness of the showup resulted in a lack of probable cause for their arrests.  *See Robinson v. Cook*, 706 F.3d 25, 34 (1st Cir. 2013).

At the time of Plaintiffs' arrests, Defendants were aware of the following evidence suggesting Plaintiffs' role in the robbery: (1) Plaintiffs and Queen matched the description of the robbers provided by the victims as African American males in their teens or twenties, wearing white or black shirts (although the police seized four individuals while the victims initially reported three robbers); (2) Plaintiffs and Queen were clustered together in close proximity to where one of the stolen phones had been tracked just minutes before; (3) Queen possessed the other of the two stolen phones; and (4) Plaintiffs were identified by at least Pierce, and both Pierce and Iovino identified Queen.  Plaintiffs argue the officers could not rely on the most crucial piece of evidence informing the probable cause determination—the witness identifications—because, before attempting to identify the suspects, the witnesses became aware that Plaintiffs and Queen were found in close proximity to where the phone with GPS was tracked, and that the other phone was found on Queen's person.  The operative question concerning probable cause, however, is not what the witnesses knew at the time they identified Plaintiffs, but what Fell and Garron knew about the witnesses' knowledge of the investigation at the time the officers conducted the showup, and how that information informed (or should have informed) the probable cause determination.  *See Orsatti*, 71 F.3d at 483 (noting probable cause determination focuses on facts and circumstances within the arresting officer's knowledge).  Thus, viewing the facts in the light most favorable to Plaintiffs, Fell and Garron were aware Pierce and Iovino knew one of the stolen phones was found on Queen before they identified the

suspects, but there is no evidence to suggest either officer knew the witnesses were informed during an earlier telephone conversation with someone from the Chester Police Department that the suspects were found in the area where one of the stolen phones was tracked.

Under the circumstances known to Fell and Garron, the identifications, while resulting from a suggestive procedure, were not wholly unreliable. A showup identification procedure is "inherently suggestive" because "it suggests that the police think they have caught the perpetrator of the crime." *United States v. Brownlee*, 454 F.3d 131, 138 (3d Cir. 2006) (citing *Stovall v. Denno*, 388 U.S. 293, 302 (1967)). Here, the retrieval of one of the stolen phones from Queen prior to the identification exacerbated the suggestiveness of the showup. An unnecessarily suggestive identification procedure, however, does not render the identification unreliable per se. *See Neil v. Biggers*, 409 U.S. 188, 199-201 (1972) (holding admission at trial of an identification produced from an unduly suggestive showup does not violate a criminal defendant's due process rights so long as the identification is sufficiently reliable); *Allen v. Estelle*, 568 F.2d 1108, 1113-14 (5th Cir. 1978) (finding showup identification in police station after witness was told his stolen property was recovered from the suspect and witness saw the stolen property was still "sufficiently reliable so as to outweigh the corruptive effect of the asserted suggestive confrontation"); *Fox v. Poole*, No. 06-856, 2008 WL 1991103, at *6 & n.3 (E.D.N.Y. May 5, 2008) (finding no error in state court's decision that showup identification wherein robbery suspect was viewed by the witnesses while holding the allegedly stolen property was nevertheless reliable based on other indicia of reliability). The reliability of an identification is determined by the totality of the circumstances, including the following factors: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness'[s] degree of attention; (3) the accuracy of the witness'[s] prior description of the criminal; (4) the

level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation." *Brownlee*, 454 F.3d at 139 (citing *Neil*, 409 U.S. at 199).

Because Plaintiffs challenge the probable cause determinations (as opposed to the admission of the identifications as evidence), this Court must examine these reliability factors as they were known to Fell and Garron at the time the arrests were made. Garron, having initially interviewed Pierce and Iovino at the crime scene, knew they had seen the robbers up close while the robbers searched their pockets, although it was nighttime. They were also able to describe the assailants' race, approximate age, and clothing, which matched those of the apprehended suspects. The witnesses, however, appear to have initially reported only three assailants, while subsequently identifying four suspects. As to the witnesses' level of certainty in their identifications, Pierce testified she was not as certain about Plaintiffs' roles in the robbery as she was about Queens', but the record is devoid of any facts suggesting she conveyed that apprehension to either Fell or Garron. Rather, Pierce testified that when asked if she could identify the suspects, she simply confirmed all four were the robbers. This account is corroborated by the testimony of Fell and Iovino. Iovino initially stated during his deposition he did not identify Plaintiffs, although later admitted it is possible he in fact had identified them because Pierce did and because he was certain Queen was the shooter. Lastly, the showup occurred soon after the robbery, when the witnesses' memories of the robbers' appearances were presumably fresh.

While perhaps there exists questions of fact regarding the reliability of the identifications of Plaintiffs under the circumstances known to Fell and Garron, this Court is hard pressed to see how any such factual issues would permit a trier of fact to find the suggestiveness of the showup procedure rendered Plaintiffs' arrests without probable cause under the totality of the

circumstances.  "'Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'  Therefore, the evidentiary standard for probable cause is significantly lower than the standard which is required for conviction."  *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005) (quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972)).  When Garron arrested Plaintiffs, Fell and Garron knew Plaintiffs matched the description of the perpetrators as black males in their teens or twenties dressed in black t-shirts and white t-shirts; Plaintiffs were found in the immediate vicinity where the stolen phone with GPS was tracked; Plaintiffs were associating with another individual matching the description of the robbers who was found carrying the other stolen phone and was identified by both victims; and Plaintiffs were identified by at least one of the victims in an identification procedure which, although corrupted in some degree by a prior identification of stolen property found on one of the suspects, nevertheless retained meaningful indicia of reliability.  These facts easily satisfy the modest evidentiary standard for probable cause even though the victims initially reported three robbers, and even if only Pierce and not Iovino identified Plaintiffs, as "the standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate."  *Id.* at 603.

Even assuming a material factual dispute remains as to whether there was probable cause, the totality of the circumstances demonstrate Defendants are entitled to qualified immunity on Plaintiffs' false arrest claims as a matter of law.  The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The qualified immunity analysis has two components:  (1) whether the facts, viewed in the light most favorable to the party asserting

11

the injury, show the official's conduct violated a constitutional right; and (2) whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A district court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A right is clearly established for qualified immunity purposes if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "The doctrine aims to exclude 'the plainly incompetent' and 'those who knowingly violate the law' while accommodating reasonable 'mistaken judgments.'" *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 148 (3d Cir. 2002) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). "If an official could have reasonably believed that his or her actions were lawful, the official receives immunity even if in fact the actions were not lawful." *Id.*

In arguing that Fell and Garron knowingly violated their rights, Plaintiffs emphasize the Defendants' testimony that informing a witness his or her stolen property was found on a suspected robber prior to conducting a showup identification would be improper as it might undermine the reliability of the identification.[7] But even if Fell and Garron knew a showup conducted after the witnesses identified the phone found on Queen might taint any identification of the suspects, that fact alone does not demonstrate they knowingly arrested Plaintiffs without probable cause, nor does it show they were clearly incompetent in determining the arrests were

---

[7] Although this testimony is consistent with Fell's and Garron's testimony they performed the identification of the suspects prior to calling the phone found on Queen, again, because the facts are construed in favor of Plaintiffs, the Court assumes for the purpose of the qualified immunity analysis that the phone identification occurred before Plaintiffs were identified. Plaintiffs also argue Fell and Garron knew it was improper to inform the witnesses one of their phones was tracked to the area in which the suspects were found, but, as discussed above, there is no evidence suggesting Fell or Garron were aware Pierce and Iovino were so informed prior to the showup.

supported by probable cause.  As detailed above, the identifications retained several indicia of reliability.  Considered together with the other crucial, undisputed pieces of evidence indicating Plaintiffs were responsible for the robbery, this Court is easily convinced no reasonable trier of fact could find it was obvious to Fell and Garron there was no probable cause to arrest Plaintiffs. *See Gilles v. Davis*, 427 F.3d 197, 205 (3d Cir. 2005) (explaining officers are entitled to qualified immunity if "there was any reasonable basis to suppose there was probable cause" (quoting *Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004))).  Defendants, therefore, are entitled to summary judgment on Plaintiffs' § 1983 false arrest claims.

Plaintiffs also assert § 1983 claims for malicious prosecution.  To succeed on their malicious prosecution claims, Plaintiffs must show (1) Defendants initiated a criminal proceeding; (2) the criminal proceeding ended in Plaintiffs' favor; (3) the proceeding was instituted without probable cause; (4) Defendants acted maliciously or for a purpose other than bringing Plaintiffs to justice; and (5) Plaintiffs suffered a deprivation of liberty as a consequence of the legal proceeding.  *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003).  Plaintiffs have not presented any evidence suggesting either Defendant arrested them for any purpose other than to bring Plaintiffs to justice.  The record creates no dispute that Plaintiffs were arrested for robbery and attempted homicide based on Defendants' reasonable belief the arrests were supported by probable cause.  Defendants therefore are entitled to summary judgment on the malicious prosecution claims.

Plaintiffs' final § 1983 claims allege a conspiracy between Fell and Garron to deprive them of their constitutional rights.  To establish liability for conspiracy under § 1983, "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under color of law.'"  *Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685,

700 (3d Cir. 1993), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).  Plaintiffs have failed to present any evidence suggesting an agreement between Defendants to violate their Fourth Amendment rights.  Plaintiffs rely solely on the fact that the witnesses identified a phone found on one of the suspects as being their stolen phone prior to identifying the suspects.[8]  This simply is not sufficient to support a claim for conspiracy.  *See Pardue v. Gray*, 136 F. App'x 529, 533-34 (3d Cir. 2005) (affirming summary judgment on conspiracy claim because plaintiff presented no evidence Defendants agreed to use false information to support criminal charges even though affidavit of probable cause contained inaccuracies); *Newton v. City of N.Y.*, 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009) (granting summary judgment on § 1983 conspiracy claim alleging, *inter alia*, false arrest based on unduly suggestive identification procedure because plaintiff presented no evidence of an agreement to violate his constitutional rights).  Accordingly, Defendants are entitled to summary judgment on the conspiracy claims as well.

Having granted summary judgment on Plaintiffs' federal claims in favor of Defendants, this Court will decline to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) (providing a district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction"); *Byrd v. Shannon*, No. 11-1744, 2013 WL 1760848, at *9 (3d Cir. Apr. 25, 2013) (affirming dismissal without prejudice of pendant state claims pursuant to § 1367(c)(3) after summary judgment was granted on all federal claims).  Therefore, Plaintiffs state law claims for malicious

---

[8]  Plaintiffs also argue Defendants conspired to violate their Fourth Amendment rights by informing the witnesses one of their phones had been tracked to the area in which Plaintiffs were found.  Again, there is no evidence of record that either Fell or Garron ever informed the witnesses of this fact.

prosecution, false arrest, false imprisonment, and intentional infliction of emotional distress are dismissed without prejudice.

An appropriate order follows.

BY THE COURT:


 /s/ Juan R. Sánchez
Juan R. Sánchez